**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHINYERE U. NWOKE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 16 C 9153** |
| **v.** | ) | |
| | ) | **Judge Jorge L. Alonso** |
| **THE UNIVERSITY OF CHICAGO** | ) | |
| **MEDICAL CENTER a/k/a THE,** | ) | |
| **UNIVERSITY OF CHICAGO** | ) | |
| **HOSPITALS AND HEALTH SYSTEM,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Chinyere Nwoke, brings this employment discrimination suit against defendant, the University of Chicago Medical Center ("UCMC"), asserting claims of racial discrimination and retaliation under Title VII of the Civil Rights Acts of 1964 and the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e *et seq*., and interference with the exercise of her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601. The parties have filed cross-motions for summary judgment, and defendant has filed an associated motion to strike and for sanctions. For the following reasons, defendant's motion for summary judgment is granted, and the other motions are denied.

### LOCAL RULE 56.1 AND MOTION TO STRIKE AND FOR SANCTIONS

Local Rule 56.1 requires a party seeking summary judgment to file, among other items, "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law," which "shall consist of short numbered paragraphs, including . . . specific references to the affidavits, parts of the record, and

other supporting materials relied upon to support the facts set forth in that paragraph." N.D. Ill. LR 56.1(a)(3). A party opposing summary judgment must file "a concise response to the movant's statement that shall contain . . . a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon," and "a statement . . . of any additional facts that require the denial of summary judgment." LR 56.1(b)(3)(B) & (C).

UCMC moves to strike plaintiff's Local Rule 56.1 statement and response, arguing that they are not concise; they smuggle in legal argument and non-responsive facts; their citations to evidence are often lacking, or they are not precise enough to determine which part of which of certain voluminous exhibits she relies on; the evidence she relies on is largely unauthenticated, and some of it lacks foundation or is inadmissible as hearsay or for some other reason; and she occasionally contradicts her own deposition testimony with unsworn statements and assertions. Additionally, UCMC states that plaintiff's filings included information UCMC had designated as confidential, but plaintiff did not properly follow the three-part process set forth in Local Rule 26.2 for filing such information—(1) provisionally filing the documents containing the confidential information under seal, (2) along with public redacted versions and (3) a motion to seal the unredacted versions—so UCMC seeks to recover the attorneys' fees it expended in addressing and correcting plaintiff's improper filings.

There is some merit in defendants' position as to the form of plaintiff's Local Rule 56.1 materials. The Court is entitled to require strict compliance with Local Rule 56.1, *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015), and plaintiff's Local Rule 56.1 statement and response are anything but "concise"; to the contrary, they are verbose and argumentative, and they often stray into facts that are immaterial to her claims or mischaracterize the documents they cite.

Still, as this Court often remarks, motions to strike are disfavored because they require the Court to "waste time by . . . engag[ing] in busywork and judicial editing," rather than "addressing the merits" of the case. *U.S. Bank Nat. Ass'n v. Alliant Energy Res., Inc.*, No. 09-CV-078, 2009 WL 1850813, at *3 (W.D. Wis. June 26, 2009). The Court bears in mind that the purpose of Local Rule 56.1 is "to isolate legitimately disputed facts and assist the court in its summary judgment determination," *Brown v. GES Exposition Servs., Inc.*, No. 03 C 3921, 2006 WL 861174, at *1 (N.D. Ill. Mar. 31, 2006), because district courts do "not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information," *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). Despite their serious shortcomings, plaintiff's Local Rule 56.1 statement and response went some way toward achieving the local rule's purpose by identifying disputed and undisputed facts and pointing to evidence in the record. Even if plaintiff cited certain hearsay statements or otherwise inadmissible evidence, at the summary judgment stage evidence need only be admissible in substance rather than form, *see Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) ("'To be considered on summary judgment, evidence must be admissible at trial, though 'the form produced at summary judgment need not be admissible.'" (quoting *Wragg v. Vill. of Thornton,* 604 F.3d 464, 466 (7th Cir. 2010))), and plaintiff may have been able to cure certain of these problems at trial.

Generally, "[p]ro se litigants are entitled to a certain amount of latitude in regard to matters of procedure." *OM v. Weathers*, No. 91 C 4005, 1994 WL 96665, at *2 (N.D. Ill. Mar. 23, 1994) (citing cases). In keeping with that principle, the Court is not inclined to strike plaintiff's documents for failing to comply strictly enough with the "technical requirements" of Local Rule 56.1, to the extent that the Court otherwise "ha[s] everything it need[s] to render a decision." *Id.*; *see Browning v. Aikman*, No. 10-2268, 2012 WL 1038540, at *3 (C.D. Ill. Mar. 27, 2012) (not

requiring *pro se* plaintiff's strict compliance with "specific technical requirements" of Central District of Illinois's equivalent of Local Rule 56.1, to the extent plaintiff "provide[d] admissible evidence establishing his claim or setting forth specific facts showing that there is a genuine issue for trial," because a "*pro se* plaintiff is entitled to a great deal of latitude where procedural requirements are concerned"). The Court need not and will not "comb[] . . . the record to locate . . . relevant information," *Delapaz*, 634 F.3d at 899, and it will disregard those portions of plaintiff's Local Rule 56.1 statement and response that are hopelessly vague, imprecise, inaccurate in relation to cited materials, immaterial, extraneous, argumentative, or improper, and that therefore do not serve the purpose of Local Rule 56.1. But the Court will not strike plaintiff's statement or response or any portion of them; it will consider them to the extent that they assist the Court in finding material facts in the record and determining whether they are genuinely disputed.

That leaves the matter of defendant's fee petition. The Court previously ruled that, given plaintiff's repeated failure to comply with this Court's local rules and instructions, especially with regard to filing information designated as confidential, defendant is entitled to recover its attorneys' fees for the time it spent reviewing and responding to plaintiff's improper summary judgment filings. (*See* May 29, 2019 Order, ECF No. 356.) Having now reviewed plaintiff's filings in detail, the Court finds that the shortcomings in plaintiff's filings, even with respect to the inclusion of documents designated confidential, were in the same vein as the above-described failures to comply with the "specific technical requirements" of local rules, for which a *pro se* plaintiff is entitled to latitude.

The Court did not find egregious misuse of confidential information that should have been filed under seal, given that plaintiff took care to redact patients' names or "identifiers." (Pl.'s App., ECF No. 347 n.2.) Defendant claims that this redaction is insufficient (*see* Mot. to Strike,

4

Dismiss, and for Sanctions at 8, ECF No. 348), and there may be some sense in which defendant is technically correct based on a strict application of the Court's Confidentiality Order (ECF No. 18) and local rules, but the most important interest was in protecting patients' identities, which plaintiff took care to do in a reasonable and customary manner. *See Bailey v. City of Chi.*, No. 08 C 4441, 2010 WL 11595680, at *5 (N.D. Ill. Oct. 13, 2010) ("[C]ourts have routinely required records containing [protected health information] to be produced with the identities of non-party actors redacted."). Further, defendant's argument makes no attempt to account for the "stark difference between so-called 'protective orders' [such as this Court's Confidentiality Order] entered pursuant to the discovery provisions of Federal Rule of Civil Procedure 26, on the one hand, and orders to seal court records, on the other," *Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 305 (6th Cir. 2016) (citing *Baxter Int'l Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002)), nor does it recognize that "[t]he right to file a document under seal does not automatically follow a confidentiality designation," given the public interest in access to information that finds its way from discovery into the court record. *Sarasota Cty. Pub. Hosp. Dist. v. MultiPlan, Inc.*, No. 8:18-CV-252-T-27AAS, 2019 WL 1244963, at *1 (M.D. Fla. Mar. 18, 2019) (citing *Baxter*, 297 F.3d at 548).

Again, with respect to the specific technical requirements of the local rules, a *pro se* plaintiff is entitled to leeway. A federal court may assess attorneys' fees as a sanction for conduct that abuses the judicial process pursuant to the court's "inherent powers, not conferred by rule or statute, to manage [its] own affairs." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S.Ct. 1178, 1186 (2017) (internal quotation marks omitted). But it must exercise such "undelegated powers" with "especial restraint and discretion." *Id.* at 1186 n. 5 (internal quotation marks omitted). After reviewing plaintiff's materials, the Court concludes that the sound exercise of discretion and the

interests of justice require denying defendant's fee petition.

**BACKGROUND**

In 2011, plaintiff, who is African-American, began working at UCMC as a Hospital Operations Administrator ("HOA"). (Def.'s LR 56.1 Stmt. ¶ 1, ECF No. 315 (Redacted) & No. 317 (Sealed).) HOAs provide clinical, consultative, and administrative support across UCMC's hospitals, particularly at night and on weekends when other administrators are absent, by ensuring appropriate staffing and bed assignments for patients; facilitating communication and record access across departments; and coordinating patient care among various treating medical professionals. (*Id.* ¶¶ 3-4.) HOAs are expected to be prompt and responsive, particularly when called or paged in urgent situations or emergencies. (*Id.* ¶ 4.) According to a manual submitted by plaintiff, HOAs "act[] as a liaison between senior management, department directors, physicians, nurses, and support staff," and they are required to "work closely with the emergency department, bed access, admitting, the staffing resource office, individual nursing units, the operating room and outpatient clinics to assure patients are assigned beds and transferred appropriately." (Pl.'s LR 56.1 Stmt. Ex. 45, Administrator Resource Manual, ECF No. 347-58 at 3-4.) UCMC administrators came to refer to this job function—the responsibility for and facilitation of the movement of patients appropriately and safely through the different departments and facilities of the hospital system during their hospital stay—as "throughput." (Def.'s LR 56.1 Stmt. ¶¶ 5-6.) Another essential job function of the position, according to the manual, is "[a]ttend[ing] all emergency situations in the Hospitals and provid[ing] administrative assistance and support." (Pl.'s LR 56.1 Stmt. Ex. 45, Administrator Resource Manual, ECF No. 347-58 at 4.)

In her 2013 performance review, plaintiff's supervisor, Tracy Pietrzyk, wrote that "[l]eadership has asked that [plaintiff] be more visible when it comes to throughput and staffing

decisions. [Plaintiff] represents leadership on her shifts and may need to make some hard decisions to facilitate patient movement." (Def.'s LR 56.1 Stmt. ¶ 13.) Pietrzyk also wrote that she "would like [plaintiff] to assert herself more with staffing and throughput issues as she is the house resource when on duty." (*Id.*) Plaintiff received an overall rating of three out of five, or "Fully Effective," but she received a two out of five, or "Partially Meets Expectations," in the category of "Throughput and Staffing Demands." (*Id.*; *see id.* Ex. 16, Pl.'s Dep. Ex. 25.) In her 2014 performance review, plaintiff received a rating of three out of five both overall and in the "Throughput and Staffing Demands" category, and Pietrzyk wrote that plaintiff "has made progress this year and has been more of an active participant in throughput and staffing." (*Id.* ¶ 14; *see id.* Ex. 18, Pl.'s Dep. Ex. 28.)

In 2015, HOAs became responsible for opening "surge units" to handle overflow when the emergency department was nearing capacity. (*Id.* ¶ 7.) At approximately 7:36 a.m. on May 11, 2015, Emily Lowder, the Executive Director of Patient Logistics and a peer of Pietrzyk's, received an email from plaintiff, in which plaintiff informed her that she had been unable to open a surge unit in "4SE" at 7:00 a.m. that morning because of a shortage of available nurses. (*Id.* Ex. 4, Lowder Decl. ¶ 20, ECF No. 310-4 (Redacted), No. 318-3 (Sealed).) Lowder could see from the correspondence copied below plaintiff's email message that plaintiff had been informed on the evening of May 10, 2015, that there would be a need to open the 4SE surge unit on the morning of May 11, 2015, and yet plaintiff had not arranged to have nurses available to staff the unit. (*Id.* Ex. 4, Lowder Decl. ¶¶ 20-21.) Lowder responded to plaintiff's email to ask that, in the future, she ensure that there are nurses available on standby (or "overtime") in order to open the surge unit if necessary, rather than let the Staffing Resource Office send standby nurses home. (*Id.* Ex. 4, Lowder Decl. ¶¶ 21-23.) Lowder relayed what had happened to Pietrzyk. (*Id.*)

Pietrzyk met with plaintiff in her office later that morning, and, according to plaintiff, she told plaintiff that she had "failed" and her performance was "poor." (*Id.* ¶ 17; *see id.* Ex. 9, Pl.'s Dep. at 228:5-229:20, ECF No. 310-9 (Redacted), No. 318-7 (Sealed).) On May 15, 2015, Pietrzyk put plaintiff on a performance improvement plan ("PIP") because of her "difficulty executing throughput as one of the required deliverables of her position as an HOA." (*Id.* ¶ 18; *id.* Ex. 24, Pl.'s Dep. Ex. 37, ECF No. 310-24.) Under the PIP, plaintiff was to lead surge planning and "demonstrate leadership with visible, timely critical[-]thinking[-]based decisions with regard to throughput and staffing demands on all of her scheduled shifts," particularly so that surges can be "executed within the appropriate time frame." (*Id.* ¶ 18; *id.* Ex. 24, Pl.'s Dep. Ex. 37.) Plaintiff and Pietrzyk were to meet once every two weeks to discuss plaintiff's progress. (*Id.* Ex. 24, Pl.'s Dep. Ex. 37; *see id.* ¶¶ 18-20.)

On the morning of October 12, 2015, Lowder received an email from Stephanie Blossomgame, a Patient Care Manager (a department-level administrator), about a "Dr. Strong" call the previous evening. (*Id.* ¶ 22.) "Dr. Strong" is a UCMC code for a disorderly or apparently dangerous patient. (*Id.* ¶ 21.) According to Blossomgame, the "Dr. Strong" patient had been medically cleared to be discharged, but he became "irate and belligerent" with the nursing staff, and he refused to leave "until they fixed his pain." (*Id.* Ex. 4., Lowder Decl. Ex. B, Oct. 12, 2015 Email from Blossomgame to Lowder.) Transportation for the patient had already been arranged and was on-site waiting for him to be discharged, but plaintiff discontinued the discharge and instructed the transporters to depart without him. (*Id.*) Plaintiff told the patient's medical team that a patient could not be discharged against his will less than twenty-four hours after he was admitted, and, if they wanted to proceed with discharge, they would have to contact UCMC's legal team or wait till the next day. (*Id.*) When Blossomgame arrived in the morning and heard what

8

had happened from her staff, she contacted plaintiff to ask for details, having never heard of any such twenty-four-hour rule, but plaintiff just referred Blossomgame back to her own staff, which Blossomgame found "inappropriate." (*Id.*) Additionally, the patient's attending physician called Lowder to complain about the incident because he had not been notified that the discharge had been canceled, and therefore he had not known to round on the patient that morning. (*Id.* ¶ 23.) Lowder, who was covering for Pietrzyk while she was out on vacation, was disappointed and concerned by these reports, and she scheduled a meeting with plaintiff to discuss the incident at 7:30 a.m. on October 16. (*Id.* ¶ 24; *id.* Ex. 4, Lowder Decl. ¶¶ 26, 28-29.) Plaintiff initially accepted the meeting invite, but at 12:57 a.m. on the 16th, she emailed Lowder to say she could not attend due to an appointment. (*Id.* ¶ 24; *id.* Ex. 4, Lowder Decl. ¶ 30, Ex. C, Oct. 16, 2015 Email from Pl. to Lowder.) Lowder was "frustrated" by the cancellation, and she told plaintiff in a return email that her failure to attend was "both unfortunate and concerning." (*Id.* Ex. 4., Lowder Decl. ¶ 31, Ex. D, Oct. 16, 2015 Email from Lowder to Pl.)

On October 17, 2015, plaintiff forwarded Lowder's email to UCMC's Employee and Labor Relations/Human Resources Department ("HR") to complain about Lowder's "strong wording[]" and to "bring this event to [HR's] attention." (*Id.* ¶ 24; *id.* Ex. 30, Pl.'s Dep. Ex. 57, Oct. 17, 2015 Email from Pl. to HR, ECF No. 310-30.) Plaintiff mentioned that she had not known what the purpose of the meeting was, but before receiving Lowder's email she had hoped that it was about "adding a black nurse manager to the new set of executive directors to the Patient Care Services to qu[ell] the buzz among the African-American UCM workforce that they are not included in such perks and appointments." (*Id.* Ex. 30.)

On October 20, 2015, Lowder received another email about an incident involving plaintiff, written by nurse Kristy Hill and forwarded to Lowder by Shawn Mabry, the Manager of Patient

Logistics, an administrator who reported to Lowder. (*Id.* ¶ 26, Ex. 4, Lowder Decl. ¶ 33.) Hill wrote that she had asked plaintiff to assign a nurse to admit a patient to the Medical Intensive Care Unit ("MICU"). (*Id.* ¶ 26.)[1] Plaintiff initially assigned a nurse named Robin to the task, and Robin "took report" for the patient (*i.e.*, gathered information about the patient). (*Id.*) According to Hill, Robin contacted plaintiff, and a short time later, plaintiff told Hill that she would ask the MICU team if the patient could be moved to "D6," a non-MICU unit elsewhere that was staffed with other nurses. (*Id.* ¶ 26, Ex. 4, Lowder Decl. Ex. E, Oct. 18, 2015 Email from Mabry to Lowder.) Hill and one of the resident physicians in the MICU were both "frustrat[ed]" by the decision, believing that the "MICU [personnel] should have say [in] where [their] patients are assigned, especially if there [are] a bed and nurse" available. (*Id.* Ex. 4, Lowder Decl. Ex. E.) Lowder was "disappointed" to learn that plaintiff had agreed to move a patient from the MICU when a bed and nurse were available. (*Id.* ¶ 26.)

On October 26, 2015, after Pietrzyk returned from vacation, she, Lowder, and Corinn Steinhaur, the Executive Director of Adult Inpatient Service, met with plaintiff and gave her an opportunity to explain what had happened in the Dr. Strong and MICU incidents. (*Id.* ¶ 29.) Plaintiff's responses did not alleviate Lowder's concerns about plaintiff's performance on those two occasions (*id.* ¶ 30), and Pietrzyk reminded plaintiff that an HOA was to act as "the lead on shift" (*id.* ¶ 31). On November 13, 2015, Pietrzyk wrote plaintiff a letter to explain that, in the Dr. Strong and MICU incidents, plaintiff had "failed to demonstrate the leadership responsibilities of [her] role as an HOA by abdicating these responsibilities to others." (*Id.* ¶ 33.) In the MICU situation, Pietrzyk explained, plaintiff should not have allowed Robin to change the "throughput

---

[1] Plaintiff purports to dispute the facts in paragraph 26 of defendant's Local Rule 56.1 statement because "Ms. Hill texted Nwoke that Robin was not needed in staffing," but the only evidence that seems to correspond to this denial is a printout of a text message that appears to have been sent on October 8, 2015, nearly two weeks before the incident in question. (*See* Pl.'s LR 56.1 Stmt. Ex. 61A, p. 19-20.)

direction" for the patient after the room was assigned and report taken because "[a]s HOA, it is [plaintiff's] role to assess the situation and determine the patient assignment, and not let the staff make those decisions." (*Id.* Ex. 38, Pl.'s Dep. Ex. 72, Nov. 13, 2015 Letter from Pietrzyk to Pl.) In the Dr. Strong situation, Pietrzyk explained, plaintiff should have spoken to the attending physician and worked with the team to facilitate the discharge, rather than simply telling them to contact the legal team or wait, and she should have informed Blossomgame of what had happened, rather than telling her just to speak to her staff. (*Id.*) According to Pietrzyk, both of these incidents "indicate[d] a leadership gap in [plaintiff's] performance." (*Id.*) Pietrzyk informed plaintiff that she was to take a leadership role in these situations, she was to work with leadership to work through issues, rather than to decline to discuss them or participate in solving them, and "[c]ontinued failure to meet Medical Center expectations [could] lead to disciplinary action up to and including termination." (*Id.*)

On June 3, 2016, Michele Akerman, another HOA, forwarded an email to plaintiff, copying Pietrzyk, Mabry, and Lowder, from Ausra Miravinskaite, in which Miravinskaite, a Patient Care Manager in the emergency department, described a "Dr. Cart" incident that had taken place the previous evening. (*Id.* ¶ 42.) "Dr. Cart" is UCMC's code for a patient's cardiopulmonary arrest. (*Id.* ¶ 40.) According to the email, at 1:50 a.m. on June 2, 2016, the emergency department ("ED") responded to a Dr. Cart call in the CT scan area. (*Id.* ¶ 42.) Although the call was for an "inpatient," *i.e.*, someone who had already been admitted to the hospital, the patient was brought back to the ED. (*Id.* Ex. 40, Pl.'s Dep. Ex. 74 at 3, Jun. 3, 2016 Email from Miravinskaite to Mabry.) Miravinskaite was "not sure" why a room was not promptly assigned for this patient and reported that the HOA on duty—plaintiff—had "not respond[ed] to calls/pages." (*Id.*) In addition to forwarding Miravinskaite's message, Akerman asked plaintiff to "share, as soon as possible, the

information" that she possessed about the incident. (*Id.* at 2.)

Plaintiff did not immediately respond. On June 6, 2016, Pietrzyk followed up and asked plaintiff to respond. (*Id.* ¶ 43, Ex. 65, Pl.'s Dep. Ex. 144, Jun. 6, 2016 Pietrzyk Email to Pl.) On June 7, 2016, Lowder followed up, writing that she had been contacted about this incident by Dr. Linda Druelinger, the head of the ED, and asking plaintiff if she could "please share [her] follow-up from this incident ASAP" so Lowder could respond to the ED team. (*Id.* Ex. 40, Pl.'s Dep. Ex. 74 at 3, Jun. 7, 2016 Email from Lowder to Pl.) At 11:53 p.m. on June 9, 2016, plaintiff responded that she was "waiting on more information" from Miravinskaite and wanted to have "more info[rmation] on how many calls [had been placed], to which phone line the calls were placed, and as well how many pages" had been sent, before answering in more detail. (*Id.*) Fourteen minutes before, at 11:39 pm, she had sent an email to Miravinskaite about the calls and pages. (*Id.* Ex. 65, Pl.'s Dep. Ex. 144, Jun. 9, 2016 Pl. Email to Miravinskaite.) At 7:45 a.m. on June 10, 2016, Miravinskaite reported to Lowder and Pietrzyk that plaintiff had been present in the CT scan area during the Dr. Cart call, but then left. (*Id.* ¶ 46.) The patient was brought back to the ED, and an ED nurse called the Bed Access Department to ask why. (*Id.*) The ED nurse was told that plaintiff was in Bed Access herself, so the ED nurse asked to speak with her, and the nurse was placed on hold; but plaintiff never picked up the call. (*Id.*)

Later that morning, Pietrzyik emailed Thomas Lloyd, an Employee/Labor Relations Manager in HR, writing that there were "several pressing issues with regard to [plaintiff], most importantly her lack of response to inquiries about a patient situation," and Pietrzyik and Lowder wanted "to meet . . . right away to plan next steps for this lack of performance." (*Id.* ¶ 47, Ex. 4, Lowder Decl. Ex. K, Jun. 10, 2016 Pietrzyk Email to Lloyd.) Lowder, whom Pietrzyk had copied, replied that she had scheduled a meeting on the situation for the next business day, "as this issue

needs urgent resolution." (*Id.* Ex. 4, Lowder Decl. Ex. K, Jun. 10, 2016 Lowder Email to Lloyd.)
On June 13, 2016, Lloyd, Pietrzyk, and Lowder met to discuss the situation. (*Id.* ¶ 49.) On June
14, 2016, Pietrzyk sent an email to Lloyd, Lowder, and Debra Albert, Chief of Nursing and Senior
Vice President of Patient Care Services, to whom Lowder and Pietrzyk reported. (*Id.* ¶ 49; *see id.*
¶ 18.) In the email, Pietrzyk recommended that plaintiff "be put on suspension until further
investigation." (*Id.* ¶ 49.) Albert had been informed about plaintiff's role in the Dr. Cart incident
and was "significantly concerned by Plaintiff's reported lack of responsiveness during the Dr. Cart
patient incident, and that she had not responded to management in substance about it, despite
attempts to contact her." (*Id.* Ex. 1, Albert Decl. ¶ 28.)

On the same day, June 14, 2016, Lloyd received notice via email that plaintiff had filed a
charge of discrimination against UCMC with the Equal Employment Opportunity Commission
("EEOC"), claiming race discrimination and retaliation and alleging that she had been disciplined,
had complained, and then was "harassed and subjected to different terms and conditions of
employment including, but not limited to, extra scrutiny." (*Id.* ¶ 52.)

Plaintiff worked on the evening of June 15, 2016, but when Pietrzyk and Lloyd went to
speak with her, they learned that she had left work to seek treatment for an illness. (*Id.* ¶ 53.)
Plaintiff returned to work on June 20, 2016, and Pietrzyk and Lloyd sought to meet with her the
following morning, but she would not do so, claiming she was too sick to meet. (*Id.* ¶ 55.) Hours
later, plaintiff sent Ms. Pietrzyk a claim number; plaintiff had been approved to take intermittent
leave under the FMLA. (*Id.* ¶¶ 55-56.)

Lloyd began investigating the Dr. Cart incident. He reached out to plaintiff to find out
what had happened, and on June 23, 2016 plaintiff finally responded, explaining that she had been
in touch with ED nurses "Joel" and "Mary" about the Dr. Cart patient's assigned bed on the

morning of June 2 in the immediate aftermath of the Dr. Cart call. (*Id.* ¶¶ 57-58.) Lloyd followed

up with Joel Hufano and Mary Kerley, the ED nurses plaintiff had mentioned, who explained that

during the Dr. Cart incident they had urgently sought plaintiff's guidance because they, as ED

personnel, could not access the patient's full inpatient records in UCMC's electronic medical

records system and therefore could not be certain how to appropriately care for the patient. (*Id.* ¶¶

60-61.) Hufano stated that while he had received a page identifying the patient's ED "Dr. Cart"

bed, the page did not address the records issue. (*Id.* ¶ 62.) Kerley confirmed the story

Miravinskaite had earlier relayed: Kerley had called Bed Access for assistance; she was told that

plaintiff was there, and indeed she could hear plaintiff in the background; she asked to speak with

plaintiff and was placed on hold; but plaintiff never picked up the phone and did not call back. (*Id.*

¶ 62.) Without plaintiff's assistance, Hufano and Kerley had had to wait for a nurse from a

different unit to travel down to the ED to help them access the patient's records. (*Id.* ¶ 63.)

To resolve certain discrepancies between plaintiff's account and Hufano and Kerley's,

Lloyd sought to meet with plaintiff, but she declined to meet, and on July 1, 2016, she notified

UCMC that she was on continuous medical leave. (*Id.* ¶¶ 64-67.)

On September 19, 2016, plaintiff attempted to report to work, but the new HOA manager

(Pietrzyk had apparently left UCMC's employment) instructed plaintiff to wait to hear from HR.

(*Id.* ¶ 71.) Lloyd reached out to plaintiff again, and plaintiff agreed to meet on September 21,

2016. (*Id.* ¶ 72.) At the meeting, she could recall little of the events of June 2, 2016, but she stated

that her June 23, 2016 email was accurate. (*Id.*) Lloyd told plaintiff not to return to work. (*Id.*)

The following day, plaintiff filed this suit. (*Id.* ¶ 73.)

Lloyd kept Lowder and Albert informed of the progress of his investigation and of his

ultimate inability to clear up certain discrepancies between plaintiff's account of the Dr. Cart

incident and the ED nurses' accounts. (*Id.* ¶ 74.) Albert determined that plaintiff's ongoing performance issues, culminating in her failure to respond to inquiries during and after the Dr. Cart incident, warranted her termination. (*Id.* ¶ 75.) Lloyd and Lowder agreed, and on November 22, 2016, UCMC issued a letter, signed by Lloyd, to inform plaintiff that UCMC had "made the decision to terminate [plaintiff] for serious on-going problems with [her] work performance, including an incident on or around June 2, 2016 in which [she] failed to respond to requests for information and support from members of the [ED's] nursing team." (*Id.*)

In her complaint in this suit, plaintiff claims that the increased scrutiny to which she was subjected for her performance on throughput issues was discriminatory, as white HOAs were not subjected to the same scrutiny; plaintiff's termination was discriminatory and retaliatory; and UCMC interfered with her FMLA rights by peppering her with inquiries about her work performance while she was on FMLA leave and terminating her. Defendant moves for summary judgment, and plaintiff has filed a cross-motion for partial summary judgment on liability.

## ANALYSIS

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009); *see Modrowski v. Pigatto*,

712 F.3d 1166, 1167 (7th Cir. 2013) (court must enter summary judgment against a party who "'does not come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question'") (quoting *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)).  The Court construes all evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016).  The Court applies these "ordinary standards for summary judgment" in the same way whether one or both parties move for summary judgment; when the parties file cross-motions, the Court treats each motion individually, "constru[ing] all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017); *see Reeder v. Carter*, 339 F. Supp. 3d 860, 869-70 (S.D. Ind. 2018).

Title VII makes it "an unlawful employment practice for an employer . . . to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  In other words, "Title VII prohibits job-related actions that are motivated by intentional discrimination against employees, based on protected employee statuses such as race or sex." *Ernst v. City of Chi.*, 837 F.3d 788, 794 (7th Cir. 2016).

"A plaintiff may prove race discrimination either directly or indirectly, and with a combination of direct and circumstantial evidence." *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017).  Under the direct method, the plaintiff must "set forth 'sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action.'" *Id.* (quoting *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir.

2012)). Under the indirect method, the plaintiff makes use of the "burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)," *McKinney*, 866 F.3d at 807 (internal citation altered), which requires her to make out a *prima facie* case by showing that "'(1) she is a member of a protected class, (2) her job performance met [the employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff.'" *Coleman*, 667 F.3d at 845 (quoting *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750-51 (7th Cir. 2006)). Under either method, plaintiff must show that she suffered an adverse employment action that "materially alter[s] the terms or conditions of employment," *Porter v. City of Chi.*, 700 F.3d 944, 954 (7th Cir. 2012), and is "'more disruptive than a mere inconvenience.'" *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009) (citing *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir. 1993)).

Critically, "the 'direct' and 'indirect' methods are not subject to different legal standards . . . [;] instead, there is a single inquiry" at summary judgment, *McKinney*, 866 F.3d at 807, which is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . or other proscribed factor caused the discharge or other adverse employment action.'" *Ortiz*, 834 F.3d at 765. Put differently, "[h]owever the plaintiff chooses to proceed, at the summary judgment stage the Court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action *because of* her [race or other protected trait]." *Carson v. Lake Cty., Ind.*, 865 F.3d 526, 533 (7th Cir. 2017); *see David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("*McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination. In adjudicating a summary judgment motion, the question remains: has the [plaintiff] produced sufficient evidence to support [or

require] a jury verdict of intentional discrimination?")  The Court must consider the evidence as a whole to determine whether the full evidentiary picture permits a reasonable inference that plaintiff's race caused defendant to treat plaintiff differently.  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).

In addition, Title VII makes it unlawful for an employer to "discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).  This type of discrimination is commonly known as "retaliation."  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006).  "A retaliation claim requires proof that the plaintiff suffered an adverse employment action because of his statutorily protected activity; in other words, the plaintiff must prove [1] that he engaged in protected activity and [2] suffered an adverse employment action, and [3] that there is a causal link between the two."  *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016).

The FMLA guarantees eligible employees of a covered employer the right to take unpaid leave for a period of up to twelve weeks for a serious health condition.  *King v. Preferred Tech. Grp.*, 166 F.3d 887, 891-92 (7th Cir. 1999) (citing 26 U.S.C. § 2612(a)(1)).  Upon return from FMLA leave, employees must be restored to the same position or an equivalent one, with the same benefits and terms of employment.  *Id.* (citing 26 U.S.C. § 2614(a)).  It is unlawful for any employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 26 U.S.C. § 2615(a)(1).  The FMLA's implementing regulations provide that the FMLA's "prohibition against interference prohibits an employer from discriminating or retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights."  29 C.F.R. § 825.220(c).  Further, "employers cannot use the taking of FMLA leave as a negative

factor in employment actions." *Id.*

## I. TITLE VII

Plaintiff claims that the increased scrutiny to which she was subjected, particularly in the form of excessive meetings, and the resulting discipline and termination were discriminatory and retaliatory in violation of Title VII.

### A. Discrimination

Plaintiff believes that she has adduced sufficient evidence not only to survive defendant's motion for summary judgment, but to entitle her to summary judgment in her favor on liability. She asserts that her supervisors harassed her by rating her performance poorly and requiring her to appear for dozens of meetings that the other HOAs did not have to attend, often ostensibly to discuss her handling of throughput issues, although UCMC had made no effort to train her on throughput. According to plaintiff, the other HOAs, who were not black, were not subjected to the same scrutiny. Further, according to plaintiff, defendant's ostensible reason for terminating her—namely, mishandling the June 2, 2016 Dr. Cart incident—is pretextual because the evidence shows that she did nothing wrong other than fail to "answer one (1) telephone call." (Pl.'s Mem. in Supp. of Cross-Mot. and Opp'n to Def.'s Mot. for Summ. J. at 17, ECF No. 342.)

#### 1. *Scope of Claim*

Defendant argues that the scope of plaintiff's claim, properly considered, is much more limited than she suggests for two reasons: (1) some of the disparate treatment plaintiff describes is untimely or outside the scope of her EEOC charge, which she filed *before* she was terminated, and therefore she has not exhausted her administrative remedies as to her termination or other such issues, and (2) the alleged disparate treatment that remains, including the unfavorable performance reviews, PIP, and increased scrutiny, was not sufficiently serious to materially alter the terms and

conditions of her employment and therefore qualify as the sort of adverse employment action that Title VII protects against.

    *a. Exhaustion of discriminatory termination claim*

"The test for determining whether an EEOC charge encompasses the claims in a complaint [is whether they] are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (quoting *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.,* 538 F.2d 164, 167 (7th Cir. 1976)). Stated slightly differently, the test is satisfied "if there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge," such that the employer has "some warning of the conduct about which the employee is aggrieved. *Cheek*, 31 F.3d at 500.

Plaintiff filed her latest-amended charge in July 2016, well after the investigation had begun into the June 2, 2016 incident that precipitated her dismissal (*see* Pl.'s LR 56.1 Stmt. ¶ 52), so the charge gave defendant "warning of the conduct about which [plaintiff was] aggrieved" and the EEOC an opportunity to redress it. *See id.* (*See* Pl.'s LR 56.1 Stmt. Ex. 3 at UCMC/EEOC 032, Aug. 1, 2016 Email from Pl. to EEOC Investigator Lamb (forwarding Lloyd's July 5, 2016 email to plaintiff about her failure to cooperate with his investigation).) The Seventh Circuit has held that when a plaintiff files an EEOC charge and is later fired in retaliation for doing so, she need not file another EEOC charge, which would "'serve no purpose except to create additional procedural technicalities when a single filing would comply with the intent of Title VII.'" *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 482 (7th Cir. 1996) (quoting *Gupta v. E. Texas State Univ.*, 654 F.2d 411, 414 (5th Cir. 1981)). Regardless of whether plaintiff's termination is seen as the culmination of the discriminatory treatment that she claims to have received during her

employment or as retaliation for complaining about that treatment, the reasoning of *McKenzie* and *Gupta* is equally apposite; plaintiff's termination is reasonably related to her claims of pre-termination disparate treatment and it would "serve no purpose" to require plaintiff to file a second charge, other than to needlessly create an additional procedural hurdle for her.

*b. Adverse employment action*

As for whether plaintiff's pre-termination disparate treatment qualifies as an adverse employment action, defendant is correct that such actions as performance improvement plans, negative performance reviews, and heightened scrutiny are generally not adverse employment actions for Title VII purposes. *See Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996); *see also Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010) ("[T]his Court has previously held that unfair reprimands or negative performance evaluations, unaccompanied by some *tangible* job consequence, do not constitute adverse employment actions.") (internal quotation marks omitted); *Cole v. Illinois*, 562 F.3d 812, 816-17 (7th Cir. 2009) (placing plaintiff on "employee improvement plan" that required him to submit daily and weekly schedules to supervisors not materially adverse action) (citing cases); *Wilson v. TecStar Mfg. Co.*, No. 04-CV-233, 2007 WL 201051, at *7 (E.D. Wis. Jan. 23, 2007) ("[I]ncreased scrutiny by a supervisor does not rise to the level of an adverse employment action") (citing *Harris v. Firstar Bank Milwaukee, N.A.,* 97 F. App'x 662, 665 (7th Cir. 2004)). But in this case, the supervisors' heightened scrutiny and negative performance evaluations were not "unaccompanied by [any] tangible job consequence," *Jones*, 613 F.3d at 671, to the extent that they justified plaintiff's discharge, which is unquestionably an adverse employment action. *See Bredemeier v. Wilkie*, No. 15 C 7514, 2018 WL 3707803, at *9 (N.D. Ill. Aug. 4, 2018) (citing *Tart v. Ill. Power Co.*, 366 f.3d 461, 467 (7th Cir. 2004)).

Although her theories of liability as expressed in her brief are muddled, plaintiff also seems

to argue that the dozens of meetings she was subjected to in order to monitor, critique, and improve her performance, particularly after the PIP was imposed in 2015, were humiliating and were so excessive as to amount to harassment and a hostile work environment.[2]  It is not clear how many such meetings there were.  Plaintiff claims that there were 141 meetings in 2015, but she also appears to admit that some subset of these concerned not plaintiff's work performance specifically but more general topics, and they included other HOAs and hospital personnel, along with plaintiff and her supervisors.  (*See* Def.'s LR 56.1 Resp. ¶ 25, ECF No. 421 (Sealed), ECF No. 411 (Redacted); Def.'s LR 56.1 Reply ¶ 35, ECF No. 422 (Sealed), ECF No. 386 (Redacted).)

Regardless of the precise number, plaintiff has not cited any case in which a Court found a supervisor's frequent meetings with a subordinate to discuss work-related issues to amount to unlawful harassment that created a hostile work environment, and the Court is aware of none.  *See O'Brien v. Dep't of Agric.*, 532 F.3d 805, 809-10 (8th Cir. 2008) ("verbal harassment and increased scrutiny" did not rise to the level of a racially hostile work environment); *see also Lee v. Cleveland Clinic Found.*, 676 F. App'x 488, 494 (6th Cir. 2017) ("Increased surveillance and discipline, whether warranted or not, do not constitute a material adverse change in the terms of employment in the discrimination context.").  Plaintiff's descriptions of these meetings, even if she claims to have subjectively found them humiliating, are closer to "complaints about overwork," *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016), and "difficulties with managers" that amount to no more than "normal workplace friction," *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004), than to complaints about a "place permeated with [the] intimidation, ridicule, and insult" that represents a typical hostile work environment. *Boss*, 816 F.3d at 920; *see also*

---

[2] Defendant argues that the Court denied plaintiff's motion to amend her complaint to assert a hostile work environment theory, but to the extent any such theory is based on "meetings," there is sufficient predicate for it in the original version of plaintiff's complaint, which mentions the meetings.  (Compl. ¶¶ 60-61.)

*Matthews v. Donahoe*, 493 F. App'x 796, 800 (7th Cir. 2012) ("[Plaintiff's] contention that [her] supervisors subjected her to a 'hostile work environment' by excessively scrutinizing her work . . . and warning her about her attendance problems, does not show a pattern of threatening or humiliating harassment or a workplace permeated with discriminatory ridicule, intimidation, or insult.").

Thus, the Court is skeptical whether the scrutiny to which plaintiff was subjected, in the form of performance reviews and meetings about her performance, was an adverse employment action by itself. But regardless, she certainly suffered an adverse employment action when she was terminated, and the Court will consider the evidence of the pre-termination scrutiny to which she was subjected to determine whether it supports an inference that she was terminated for a discriminatory reason. As the following discussion will show, it ultimately makes no difference how broadly or narrowly the Court conceives of the adverse employment action plaintiff suffered because she lacks sufficient evidence that it was the product of a discriminatory or retaliatory motive.

### 2. *Whether A Discriminatory Motive Caused Plaintiff's Adverse Treatment*

Plaintiff mentions both the direct method of proof and the *McDonnell Douglas* burden-shifting method in her principal brief, so the Court will first consider the evidence as it fits within the *McDonnell Douglas* framework, and then "assess cumulatively all the evidence . . . to determine whether it permits" or requires a jury to find that the scrutiny and discharge plaintiff suffered are "attributable to her . . . race." *David*, 846 F.3d at 224.

### a. <u>*McDonnell Douglas* approach</u>

Under the *McDonnell Douglas* burden-shifting approach, if plaintiff meets her burden of establishing a prima facie case by showing that she met the employer's legitimate expectations but

suffered an adverse employment action while similarly situated co-workers not in her protected class were treated more favorably, then the burden shifts to defendant to provide a legitimate non-discriminatory reason for its action. *Coleman* 667 F.3d at 845. If defendant succeeds, the burden shifts back to plaintiff to prove that defendant's reason is a pretext for discrimination. *Id.*

Undisputed facts show that plaintiff is African-American and that she suffered an adverse employment action when she was terminated (if not before). Therefore, the Court focuses on whether plaintiff has shown that she was meeting legitimate performance expectations (and whether her termination for failing to meet them was a pretext for discrimination, which is the other side of the same coin) and whether similarly situated co-workers outside the protected class were treated more favorably.

> i. *Legitimate performance expectations and pretext*

The parties dispute whether plaintiff was meeting legitimate performance expectations, but because plaintiff argues that defendant is "lying about its legitimate employment expectations in order to set up a false rationale for terminating [her,] the question of whether [s]he was meeting [defendant's] legitimate expectations merges" with the question of pretext, and the Court may focus on pretext from the start. *Senske v. Sybase, Inc.*, 588 F.3d 501, 507-08 (7th Cir. 2009).

Plaintiff claims that the Dr. Cart incident must have been a mere pretext for her termination and no reasonable factfinder could believe that she was fired for failing to answer a single phone call. But this mischaracterizes the evidence because it is neither precisely what the administrators knew about what she did, nor is it why they say they decided to fire her.

First, Kerley's account of her attempt to contact plaintiff following the Dr. Cart call suggested that plaintiff may have done more than merely miss a phone call; rather, it seemed that she willfully ignored it, despite undisputedly knowing of the Dr. Cart situation, which was what

had prompted Kerley to call her. Although the situation was serious and plaintiff was supposed to be taking a leading role in ensuring that patients were placed appropriately and safely according to their needs in such situations, Kerley's account suggested that plaintiff may not have done so, leaving the emergency department nurses to decide for themselves what to do. In this respect, the Dr. Cart incident was the culmination of a persistent and recurring performance issue, appearing as early as plaintiff's 2013 performance review as well as in the surge unit, Dr. Strong, MICU, and Dr. Cart incidents: plaintiff's unwillingness to assert herself as a leader in order to drive and implement decisionmaking on throughput issues.

Further, Lloyd, Lowder, and Albert were disturbed not only by plaintiff's lack of responsiveness to the emergency department nurses on the night of the Dr. Cart incident, but also her lack of responsiveness to the administrators' subsequent inquiries about the situation, which prevented them from clearing up the discrepancies between plaintiff's account and Kerley and Hufano's accounts. This failure to be forthcoming with information about the incident in its aftermath, like plaintiff's handling of the incident itself, played a role in the decision to terminate her, along with her record of poor performance in throughput. (*See* Def.'s LR 56.1 Stmt. ¶ 75.)

To demonstrate pretext, plaintiff must demonstrate not just "faulty reasoning or mistaken judgment on the part of the employer," but that the employer's reason is a "lie, specifically a phony reason" for the adverse employment action. *Tibbs v. Admin. Office of the Ill. Courts*, 860 F.3d 502, 506 (7th Cir. 2017) (internal quotations marks omitted). She may do so by pointing to evidence that the proffered reason "is without factual basis or is completely unreasonable." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013). But she has not done so. "Merely disagreeing with an employer's reasons" does not make them pretextual, *id.*, and plaintiff has not demonstrated that defendant's explanations for its actions toward her are "fishy enough to support an inference

that the real reason must be discriminatory." *Cf. Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011).

Particularly with respect to the Dr. Cart incident, plaintiff does not genuinely dispute the truth of the facts defendant relied on in terminating her; she "merely quibbles with the wisdom of [her] employer's decision." *Lord*, 839 F.3d at 564. But it is "exactly [that] type of personnel management decision[] that federal courts do not second-guess." *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 698 (7th Cir. 2017); *see Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017) ("It is . . . possible that [defendant] punished [plaintiff] too harshly . . . . But this court does not act as a superpersonnel department." (internal quotation marks omitted)); *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 883 (7th Cir. 2016) ("[Defendant] concluded . . . that [plaintiff's] interpersonal issues were a problem for the company. The record does not suggest that [defendant's] rationale was insincere or pretextual, and we do not sit as a superpersonnel department that judges the wisdom of defendant's decisions." (internal quotation marks and alterations omitted)). Plaintiff does not meet her burden of demonstrating that she was meeting legitimate performance expectations or that defendant's determination that she was not meeting them was a pretext for discrimination.

### ii. *Similarly situated co-workers treated more favorably*

Even if plaintiff's job performance suffered from serious shortcomings on throughput and staffing decisions, plaintiff might still be able meet her burden to state a *prima facie* case if she can show that similarly situated co-workers suffered from similar shortcomings, but were treated more favorably. "'When a plaintiff produces evidence sufficient to raise an inference that the employer applied its legitimate expectations in a disparate manner, the second and fourth prongs of *McDonnell Douglas* merge, allowing the plaintiff to establish a prima facie case by establishing

that similarly situated employees were treated more favorably.'" *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 492 (7th Cir. 2014) (quoting *Grayson v. O'Neill,* 308 F.3d 808, 818 (7th Cir. 2002)).

Plaintiff claims that the other HOAs, who were not African-American, were similarly situated but treated differently. Determining whether employees are similarly situated requires a flexible, common-sense inquiry that depends on the factual context; there is no "'magic formula.'" *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 636 (7th Cir. 2001)). The purpose of requiring comparators to be similarly situated is "to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable"—in this case, the employee's race. *Humphries*, 474 F.3d at 405. "[D]istinctions can always be found in particular job duties or performance histories or the nature of the alleged transgressions . . . , but the fundamental issue remains whether such distinctions are so significant that they render the comparison effectively useless." *Id.* "[I]n deciding whether two employees [are similarly situated because they] have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness." *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007).

In this case, the comparisons plaintiff makes between herself and the other HOAs are not useful because "she has not come forward with evidence that [they] shared a 'comparable set of failings' with her." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642-43 (7th Cir. 2008) (quoting *Burks*, 464 F.3d at 751). The evidence plaintiff cites in her brief (*see* Pl.'s Mem. at 15 (citing Pl.'s Am. LR 56.1 Resp. ¶¶ 77-79, ECF No. 370)) is not sufficient to show that the other HOAs engaged in misconduct of "comparable seriousness."

First, plaintiff purports to cite evidence showing that the other HOAs also failed to open surge units on certain occasions, but she does not say—and it does not appear from the evidence she cites—that they failed to do so in situations similar to the one for which she was reprimanded in May 2015. Specifically, it does not appear that their failure to open surge units was a consequence of their own failure to arrange for nurses to be available to staff them, unlike in plaintiff's May 2015 incident. In fact, plaintiff has not pointed to any situation in which any failure to open a surge unit was ultimately due to any HOA's negligence or mistake; the evidence shows that, in the incidents plaintiff indicates, further investigation showed that the HOAs had placed patients appropriately and any failure to open surge units was due to a genuine staffing shortage beyond the HOAs' control. (*See* Pl.'s LR 56.1 Resp. ¶ 77.)

Plaintiff does not specifically rebut this evidence. (*See id.*) Instead, she asserts that the other HOAs received training on throughput but she had not, but the evidence she cites does not suggest that this was so in any way that supports a conclusion of disparate treatment. Plaintiff points to emails evidencing a "throughput learning exercise" that Pietrzyk conducted in March 2016, but this was long after the May 2015 incident for which she was placed on a PIP. Further, plaintiff was copied on the emails, and she was designated a "required attendee," so there is no evidence of any attempt to exclude plaintiff. (*See id.* (citing, *inter alia*, Ex. 8A).)

Next, plaintiff claims that there was an incident in October 2015 when Michele Akerman failed to discharge a patient without being disciplined, scrutinized, or reprimanded, unlike plaintiff following the Dr. Strong incident. But plaintiff has few details about this incident, and those few are based on second-hand knowledge. Further, even assuming that what plaintiff heard about this incident is correct, it appears to have involved a mother whose baby was also an inpatient at UCMC and whose discharge was pushed till the following morning so it could be coordinated by "social

workers" and a "multidisciplinary" team. (*Id.* Ex. 9, Pl.'s Dep. at 303:4-304:2.) Plaintiff has not explained why or how this incident meaningfully compares to her Dr. Strong incident, in which a belligerent patient suspected of "seeking drugs" refused to be discharged for no apparently legitimate reason, and in which there would not have been the same need to involve the same social workers or "multidisciplinary people." (*See id.* Ex. 4, Lowder Decl., Ex. F, Oct. 21, 2015 Email from Pl. to Lowder.)

Plaintiff has not shown that similarly situated co-workers were treated differently because she has not shown that other employees wrongly failed to open surge units or discharge patients promptly, or that the incidents were of comparable seriousness to the ones for which plaintiff was reprimanded. On top of all that, none of these incidents resembles the MICU incident or the Dr. Cart incident (which was the nearest cause of plaintiff's termination), so even if the comparisons plaintiff submitted were good ones, they would still be insufficient to show that her co-workers suffered from a "comparable set of failings." Plaintiff has not met her burden to establish that similarly situated co-workers outside the protected class were treated more favorably.

### iii. Conclusion

As the foregoing discussion shows, plaintiff cannot make out a *prima facie* case under the *McDonnell Douglas* burden-shifting method because she has not adduced sufficient evidence that she was meeting legitimate performance expectations or of similarly situated non-black employees who were treated differently. Even if she had, defendant has adduced evidence of a history of persistent issues with plaintiff's performance in throughput and staffing dating back years, and plaintiff's handling of the June 2, 2016 Dr. Cart incident, viewed through the lens of this history of performance issues, provided a legitimate non-discriminatory reason for defendant's adverse action. Further, plaintiff has not adduced evidence that would permit a reasonable factfinder to

conclude that this reason was pretextual, as the core facts underlying plaintiff's performance issues on June 2, 2016 and before are not genuinely disputed.

    *b. Direct Method*

Alternatively, a Title VII plaintiff can prevail under the direct method of proof by presenting evidence of "something akin to an admission" of a discriminatory motive by the employer, and/or by presenting enough circumstantial evidence to "permit the same inference without the employer's admission." *Coleman*, 667 F.3d at 860. Such circumstantial evidence may consist of evidence of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe*, 20 F.3d at 736; *see Coleman*, 667 F.3d at 860. It may also consist of evidence of more favorable treatment of similarly situated individuals outside the protected class, or evidence of pretext. *Coleman*, 667 F.3d at 860.

Plaintiff's evidence of a discriminatory motive falls into three categories: evidence of pretext, evidence that similarly situated employees were treated more favorably, and evidence of defendant's behavior toward other members of plaintiff's protected class. The Court has already explained why the evidence in the first two categories does not aid her in surmounting the summary judgment hurdle. The evidence in the third category gets her no closer.

Plaintiff does not cite any outright admissions of a discriminatory motive, nor does she cite any relevant, specific examples of behavior toward or comments directed at other employees in the protected group. The closest she comes is to make certain oblique, passing, or generalized references in some places to complaints that she made during her employment about "racial hostility and disparate treatment of herself [and] Black/African-American employees, patients and visitors." (Def.'s LR 56.1 Reply ¶ 1; *see id.* ¶¶ 2-3; Def.'s LR 56.1 Resp. ¶ 32 (disputing plaintiff's

characterization of one of the issues in the EEOC investigation following the filing of plaintiff's charge as the "segregation of patients and shortage of resources in the predominantly black hospital [at UCMC], Mitchell," as the charge does not mention any such issues), *id.* ¶ 51 (responding to plaintiff's evidence of generalized complaints she made to other administrators during her employment about treatment of patients and conditions in Mitchell, which did not concern explicit racism or racial bias in employment decisions).)  Plaintiff does not provide sufficient detail or context about the incidents she mentions to link them, or the views she holds about UCMC based on them, to any wrongdoing by the individuals who were instrumental in her termination in such a way as to reveal any racial bias that may have infected those individuals' decisionmaking in employment matters.  Any nexus between these incidents and plaintiff's treatment would be too tenuous to support an inference of racial discrimination.  *See Hobgood*, 731 F.3d at 644 (citing cases in which "ambiguous or isolated comments" were insufficient to "support a case of illegal discrimination or retaliation"); *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 722–23 (7th Cir. 2008) (plaintiff must "present *specific facts* showing a genuine issue to survive summary judgment") (citing *Lucas v. Chi. Trans. Auth.*, 367 F.3d 714, 726 (7th Cir. 2004) (refusing to consider plaintiff's conclusory assertions that African-Americans were treated "more harshly" in that they were given tougher assignments and written up for reasons non-African-Americans were not where plaintiff offered no specific instances of support for his assertions)).  None of this evidence suggests that any of the individuals who reviewed plaintiff's performance or made decisions that affected her employment suffered from any racial bias.

In her brief and Local Rule 56.1 statement and response, plaintiff frequently relies on the fact that she was the only black HOA as support for her claims.  But by itself, that fact provides her with little support claims, if any.  If she could adduce evidence that the administrators who

supervised her and made employment decisions that affected her had treated all black employees badly, it might suggest an inference that their actions were motivated by race, to the extent that "the only characteristic the [employees who were treated badly] . . . had in common was their [race]." *Hall v. City of Chi.*, 713 F.3d 325, 333 (7th Cir. 2013). But when the only employee shown to have received adverse treatment from those individuals is also the only member of the protected class, the Court is "left to speculate which among [plaintiff's] various traits and statuses led to" the adverse treatment, and "[s]peculation is not enough." *Id.* There must be other evidence pointing to a discriminatory motive.

That shortcoming is fatal to plaintiff's claim. Even if the Court were to assume that defendant's scrutiny and termination of plaintiff were unreasonable, the fact that she is a member of a protected class who was treated unreasonably is usually not enough by itself to allow an employment discrimination plaintiff to survive summary judgment; there must be some other evidence pointing toward a discriminatory motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("But a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason."). As the Court has explained above, and contrary to plaintiff's position, there is no relevant evidence of harsh treatment of other African-Americans or more favorable treatment of similarly situated employees of other races, nor is there any other evidence of an improper, racially discriminatory motive for defendant's treatment of plaintiff.

In this respect, this case is similar to *Lane v. Riverview Hospital*, 835 F.3d 691, 697 (7th Cir. 2016), in which the plaintiff claimed that his employer had lied about its reasons for terminating him and that a similarly situated employee outside the protected class was not disciplined for misconduct similar to the plaintiff's. The Seventh Circuit explained that the

employees were not similarly situated from their supervisor's standpoint because, after investigation, the supervisor believed that the alleged comparator had not actually committed the misconduct at all, but the plaintiff had. *Id.* at 696-97. Thus, the comparison lacked "substance," the Seventh Circuit explained, and therefore, even assuming that there was some dishonesty in employer's reason for the employment action, where there was no other evidence of a discriminatory motive, the evidence was not sufficient to survive summary judgment. *Id.* at 697-98; *see also Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105–06 (7th Cir. 2012) ("Perhaps their supervisors' criticisms were unfair—clearly the plaintiffs feel that they were—but there is no evidence that they were unfair because they were motivated by race, as Title VII forbids.") This case is no different.

Thus, the result does not change when the Court "assess[es] cumulatively all the record evidence without the assistance of the *McDonnell Douglas* paradigm" under the direct method of proof. *David*, 846 F.3d at 227. Plaintiff has not adduced sufficient evidence of pretext, similarly situated employees treated differently, or behavior toward or comments directed at other employees in the protected group showing racial animus or bias, either separately or in combination, to permit a reasonable jury to conclude that she was the victim of intentional discrimination. Plaintiff cannot survive summary judgment on her discrimination claim.

**B. Title VII Retaliation**

Plaintiff also claims that defendant's scrutiny and ultimate termination of her were the result of unlawful retaliation for opposing unlawful employment practices. According to plaintiff, she first engaged in protected activity on October 20, 2015, when she emailed HR to complain about Lowder's email to her and mentioned the "buzz" around the hospital that black employees did not receive the same "perks" that other employees did. Plaintiff has not raised a genuine factual

dispute over whether her scrutiny and termination were in retaliation for this or any other protected activity, up to and including her EEOC charge.

First, any position that these actions were the product of a retaliatory motive is undermined by the fact that the performance issues for which plaintiff was scrutinized and ultimately fired arose long before plaintiff engaged in any protected activity. Plaintiff was criticized for her performance on throughput and staffing decisions as early as her 2013 performance review, and the surge unit and Dr. Strong incidents both occurred before plaintiff engaged in protected activity by complaining about race discrimination against UCMC employees. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (when "negative reports identified performance deficiencies . . . that were consistent with [the plaintiff's] first performance evaluation, which preceded her [protected activity,] [t]his alone undermines the reasonableness of any inference that [the protected activity] triggered criticism of her job performance"). Plaintiff may view these separate incidents as unrelated to the ones that followed her protected activity, but, as the Court has explained, there is a throughline connecting them: each of them reveals her unwillingness to assert herself as a leader in order to drive and implement decisionmaking on throughput issues.

As explained above, defendant cited a lengthy history of documented performance issues, culminating in the Dr. Cart incident and in plaintiff's lack of responsiveness during the investigation of the incident, to justify its treatment of plaintiff and her termination, and plaintiff has not shown that there is any genuine dispute as to the facts underlying these issues. Plaintiff may contend that the scrutiny and resulting punishment that she suffered were overly harsh responses to her transgressions, but that is merely to "quibble[] with the wisdom of [her] employer's decision[s]," *Lord*, 839 F.3d at 564, which does not help her to survive summary judgment. *Burton*, 851 F.3d at 698; *Bagwe*, 811 F.3d at 883. Defendant's motion for summary

34

judgment is granted as to plaintiff's Title VII retaliation claim.

## II.    FMLA RETALIATION AND INTERFERENCE

The Court generally "evaluate[s] a claim of FMLA retaliation the same way that [it] would evaluate a claim of retaliation under other employment statutes, such as . . . Title VII." *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). An FMLA plaintiff must adduce evidence that "(1) he engaged in a protected activity; (2) his employer took an adverse employment action against him; and (3) there is a causal connection between the protected activity and the adverse employment action." *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012). "To succeed on a retaliation claim, the plaintiff does not need to prove that retaliation was the *only* reason for her termination; she may establish an FMLA retaliation claim by showing that the protected conduct was a substantial or motivating factor in the employer's decision." *Goelzer v. Sheboygan Cty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010) (internal quotation marks omitted).

Plaintiff claims that she was terminated in retaliation for taking FMLA leave, in interference with her FMLA rights, but she can no more survive summary judgment on this claim than she can on her Title VII retaliation claim. As explained above, defendant has shown that she was terminated for her lack of responsiveness during and after the Dr. Cart incident, following a history of documented performance issues, and plaintiff has not come forward with evidence creating any genuine factual dispute on the issue.

Importantly, there is no reason for suspicion based on the timing of the termination compared with the timing of the FMLA leave because, as the Court has already explained, Pietrzyk and Lowder began investigating plaintiff's role in the Dr. Cart incident just days after it happened, before plaintiff sought FMLA leave. There is no evidence that any of the decisionmakers involved in supervising, disciplining, or ultimately terminating plaintiff learned that plaintiff was seeking

to take FMLA leave until June 21, when plaintiff emailed Pietrzyk about her FLMA leave request. (*See* Def.'s LR 56.1 Resp. ¶ 64.)  It was eleven days earlier, on June 10, 2016, that Lowder wrote to Lloyd in an email that there were "several pressing issues with regard to [plaintiff], most importantly her lack of response to inquiries about a patient situation," and that she and Pietrzyk wanted to meet with him to plan "next steps for this lack of performance."  (Def.'s LR 56.1 Stmt. ¶ 47, Ex. 4, Lowder Decl. Ex. K.)  *See Argyropoulos*, 539 F.3d at 734 (no reasonable inference of retaliation based on suspicious timing when adverse action was based on performance deficiencies that were first documented before plaintiff engaged in protected activity).  In any case, even if the Court were to consider the timing suspicious, suspicious timing by itself is generally not enough to prove causation, *Silk v. Bd. of Trs., Moraine Valley Cmty. Coll. Dist. No. 524*, 795 F.3d 698, 710 (7th Cir. 2015), and plaintiff has no other evidence sufficient to create a genuine issue of fact on whether defendant had an improper motive for terminating her.

To the extent that plaintiff's claim is that she was terminated not in retaliation but otherwise "to prevent her from exercising her right to return to her prior position" under the FMLA, *Simpson v. Office of Chief Judge of Circuit Court of Will Cty.*, 559 F.3d 706, 712 (7th Cir. 2009), the result is the same.  "[A]n employee's right to reinstatement [following FMLA leave] is not absolute." *Id*. If plaintiff would have been terminated anyway, regardless of whether she took FMLA leave, then the termination did not interfere with her FMLA rights.  *Id.*  Plaintiff has not come forward with evidence to create a genuine material factual dispute on the question of why she was terminated and whether it would have happened even if she had never taken FMLA leave, any more than she has on the question of whether it would have happened if she were not a member of a protected class.  *See id.* at 713-14.

Plaintiff also claims that UCMC interfered with her FMLA rights by contacting her while

she was on leave, particularly through Lloyd in late June 2016 and early July 2016, when he reached out to her several times by phone and email to attempt to set up a meeting to discuss the June 2 Dr. Cart incident and its aftermath. Lloyd had been seeking to set up such a meeting for approximately two weeks by the time plaintiff informed UCMC on July 1 that she was on continuous medical leave and would not return to work until further notice. He followed up with a few more emails and phone calls over the next few days (plaintiff says there was an email exchange of twelve emails and five phone calls, although it is not clear precisely when these contacts occurred (Def.'s LR 56.1 Reply ¶¶ 67-68)), but finally he told plaintiff in his July 5, 2016 email that if there was "anything [she] wish[ed] to add" while he proceeded with the investigation, she could either "do so" immediately, or "let [him] know that [she] will meet to do so upon [her] return." (Def.'s LR 56.1 Reply ¶ 69; Def.'s LR 56.1 Stmt. Ex. 2, Lloyd Decl. Ex. BB, Jul. 5, 2016 Lloyd Email to Pl.) His attempts to contact her then subsided until she attempted to return to work in September.

"A few *de minimis* work[-]related contacts with the employee while on . . . [leave are] allowed under the FMLA." *See LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, No. 16-1138-DRH, 2018 WL 4491183, at *12 (S.D. Ill. Sept. 19, 2018) (citing cases); *see also Daugherty v. Wabash Ctr., Inc.*, 577 F.3d 747, 751 (7th Cir. 2009) (employer's "[m]odest requests" such as for return of keys and passwords do not interfere with FMLA leave), *O'Donnell v. Passport Health Commc'ns, Inc.,* 561 F. App'x 212, 216-18 (3rd Cir. 2014) (no interference because emails requesting paperwork were "*de minimis*" and "did not require O'Donnell to perform work to benefit the company and did not materially interfere with her leave") (citing *Callison v City of Philadelphia*, 430 F.3d 117, 121 (3rd Cir. 2005) ("there is no right in the FMLA to be 'left alone'")). Lloyd's few contacts with plaintiff to follow up on the Dr. Cart incident fall within this *de minimis* rule.

Critically, the investigation and the contacts began *before* plaintiff had informed UCMC or Lloyd that she was on continuous leave, *see O'Donnell*, 561 F. App'x at 217-18, and once Lloyd learned that she was on leave, he made a limited number of follow-up contacts over three of the next five days, then dropped the matter until plaintiff was ready to return to work. This did not materially interfere with plaintiff's leave.

Plaintiff also claims that Lloyd violated her FMLA rights by contacting MetLife, UCMC's third-party benefits administrator, to inquire about her expected return-to-work date, but it is undisputed that these were no more than inquiries, and they did not shorten or otherwise affect plaintiff's leave. (Def.'s LR 56.1 Reply ¶ 70.) Plaintiff was permitted to take the FMLA leave she sought, and there is no evidence that she was asked to perform any work for which UCMC was being paid while she was on leave or that she was rushed back to work before she was well enough to return. She has not come forward with evidence creating a genuine issue of material fact as to whether defendant interfered with her FMLA leave.

The parties discuss other issues in their briefs, including a number of UCMC's defenses and whether plaintiff is judicially estopped to claim as damages treatment for certain health conditions that she attributed in a different lawsuit to ingesting xanthan gum. But the Court need not reach these issues. It is clear from the above discussion that plaintiff has not come forward with sufficient evidence that she suffered adverse treatment that was the product of a discriminatory motive, and, therefore, her claims cannot survive defendant's motion for summary judgment.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for partial summary judgment [341] is denied, defendant's motion to strike [406] is denied, defendant's petition for attorneys' fees [357] is denied, and defendant's motion for summary judgment [306] is granted. Civil case terminated.

**SO ORDERED.**

**ENTERED: March 13, 2020**

_____
**HON. JORGE ALONSO**
**United States District Judge**